## Richmond.

NORFOLK & WESTERN RAILWAY CO. v. CHEATWOOD'S ADMINIS-
TRATRIX.

### January 12, 1905.

1. INSTRUCTIONS—*Evidence to Support.*—An instruction is to be read in
the light of the evidence and in connection with other instructions
given in the case, and if when so read there is any evidence tend-
ing to support it, and it correctly states the law, it should be given.

2. DEATH BY WRONGFUL ACT—*Elements of Damage.*—In ascertaining the
damages for a husband's death by wrongful act or neglect, the jury
should consider the pecuniary loss to his widow and infant chil-
dren, fixing the same at such sum as would be equal to the probable
earnings of the deceased, taking into consideration his age, busi-
ness capacity, experience, habits, health, energy and perseverance
during what would probably have been his lifetime if he had not
been killed; and recognized scientific tables may be used in deter-
mining his expectancy. To the sum thus fixed may be added com-
pensation for the loss of his care, attention and society to his said
wife and children, and such further sum as the jury may deem
fair and just by way of solace and comfort to said wife and children
for the sorrow, suffering and mental anguish occasioned to them
by his death.

3. RAILROADS—*Employer's Liability Act—Contributory Negligence—Con-
stitutional Provision.*—The provision of the Constitution and of the
Act of Assembly, that knowledge by a railroad employee of defec-
tive or unsafe machinery, ways, appliances or structures, shall be
no defense to an action for an injury caused thereby, does not de-
stroy the defense of contributory negligence, but merely abrogates
the previously existing rule on that subject, which forbade recovery
if he knowingly used defective machinery, and declares that such
knowledge shall not of itself bar a recovery.   Such knowledge,

however, is still a very important factor in determining whether, with the knowledge the employee had, and in view of all the evi- 'dence in the case, he used that degree of caution required in his situation, with reference to the appliances causing his injury.

4. CONSTITUTIONAL LAW—*Copy from Another State—Construction.*— Where a constitutional provision or statute of one State, which has been construed by its highest court, is adopted by another State, the construction so given is adopted also.

5. MASTER AND SERVANT—*Two Ways of Doing Work—One Not Known by Servant.*—Where there are two ways of doing a thing, one danger- ous and the other safe, both open to a servant, it is, as a rule, the duty of the servant to use the safe way, but this rule does not apply where the servant does not know of the safe way, and it is not pointed out to him, and he is not chargeable with negligence in not knowing it.

6. MASTER AND SERVANT—*Railroads—Dangerous Place—Notice—Negli- gence.*—A servant who, in the due course of his employment, has frequently ridden on the side of tenders of engine which passed very close to a sand-house standing near the track, having barely room enough for his body between the tender and the sand-house, is not chargeable with negligence for riding in a like position on a wider tender of different construction, unless he knew, or by the exercise of reasonable and ordinary care, ought to have known, it was wider and of different construction.

7. MASTER AND SERVANT—*Unusual Risks—Ordinary Risks—Notice.*—A servant is not presumptively chargeable with notice of a peculiar and unusual state of things. Reasonable time must be allowed for him to learn of changes in the situation. He is presumed, how- ever, to be aware of defects which are perfectly obvious to his sight, and the danger of which is apparent to any person of his mental capacity. But to charge him with notice on this ground, the defect and danger must be unquestionably plain and clear, so that if he did not see it, he must necessarily have been in fault.

Error to a judgment rendered by the Corporation Court of the city of Radford, in an action of trespass on the case, wherein the defendant in error was the plaintiff, and the plaintiff in error was the defendant.

*Affirmed.*

The opinion states the case.

*Archer P. Phlegar* and *John R. Johnson,* for the plaintiff in error.

*Longley & Jordan,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

The administratrix of W. J. Cheatwood, deceased, brought this action in the Corporation Court of the city of Radford, alleging that the death of her intestate was due to negligence of the defendant, the Norfolk & Western Railway Company, and recovered a judgment for $6,250.00, to which the defendant obtained this writ of error.

Viewed as upon a demurrer to the evidence, the case before us is as follows:

Cheatwood, the deceased, was, on the 10th day of July, 1903, and had been for at least twelve years prior, in the employ of the plaintiff in error on its yard at Radford, as assistant "hostler." Upon the yard, among other things, were a round-house, water-tank, sand-house and coal-wharf. The duties of the deceased, among others, were to assist the "hostler" in taking engines over the yard, getting coal, water and sand, and running them back to the round-house. In doing this he opened and closed the switches, and gave signals to the "hostler" for starting and stopping at the proper places. There was no rule of the company prescribing the place where he should ride on the engine, and when the engine was moving forward, the usual place occupied by him and other employees performing the same duties, was on the step on the right-hand side of the pilot at the front of the engine; and, when moving backward, on a step on the same side of the tender, at the rear end, which, when moving backward, was in front, and which positions were the most convenient for the assistant "hostler," and the usual position occu-

pied by the assistant "hostler," for the transaction of his business.

A number of years prior to the accident resulting in the death of Cheatwood, a sand-house was built on the north side of one of the tracks in the yard, and at a distance from the track which was free from danger to employees riding on the outside of the engines and tenders which were then in use, the plaintiff in error then using tenders holding only four thousand (4,000) gallons of water. There were four steps on each tender, one at each corner, all alike, and the steps projected from the sides of the tender to about nine and one-half ($9\frac{1}{2}$) inches from the sand-house, when passing it. Afterwards, and perhaps a year or more (just when does not appear) before the accident to Cheatwood, plaintiff in error increased the size of its tenders, so that they would hold five thousand (5,000) gallons of water, which was accomplished by extending the sides of the tenders until they were flush with the inside of the steps, the steps being seven and a half ($7\frac{1}{2}$) inches wide, but the distance of the steps from the centre of the track, and consequently from the sand-house, was not changed. Later, plaintiff in error increased the size of some of its tenders, so as to hold six thousand (6,000) gallons of water, this being accomplished by again extending the sides until they became flush with the outside of the steps, which still remained nine and one-half ($9\frac{1}{2}$) inches from the sand-house, but practically under the tender, as the outside of the tender was flush with the outer edge of the steps. On the rear end of the tender was a cross-beam eight and three-fourths ($8\frac{3}{4}$) inches wide, extending the width of the tender. This was reached by a hand-hold on the corner of the tender, extending from the sill to within twelve or fourteen inches of the top of the tender, and by catching this hand-hold a person could get up on the steps and from there could step to the cross-beam, and when standing there could hold by this hand-hold, or to the top of the tender, which was about as high as an ordinary man's head.

Prior to the accident to Cheatwood, on July 10, 1903, he and others in the same employment repeatedly rode by the sand-house on the steps of the engines and tenders then in use on the yard, though in order to do so they had to stand very close to the side of the tender, there being (if it was a five thousand gallon tender) but one or two inches between the body and the sand-house, and this had been done without accident to him or any one, and with full knowledge on the part of plaintiff in error that it was the custom of such employees to so ride on the tenders, in performing the duties of assistant "hostler." Between the 1st and 10th of July, 1903, a six thousand (6,000) gallon tender appeared upon the yard at Radford, just at what time does not appear, but it is certain that Cheatwood was not called on to handle it until the night of the 10th, and on that night engine No. 771, having a six thousand (6,000) gallon tank (tender) was taken to the coal wharf, with Cheatwood as assistant "hostler." Returning from the wharf, with the tender in front, he was riding upon the step of the tender, where he had been in the habit of riding when performing his duties, the step being under the tender, as stated, differing in this respect only from the tenders formerly run over the yard, and this change made it impossible for a man to pass the sand-house standing on that step, as the side of the tender was only nine and one-half (9½) inches from the sand-house. As a necessary consequence, Cheatwood was mashed between the tender and the sand-house and received injuries from which he died the next day.

At the trial, and after the introduction of all the evidence, the court at the instance of the defendant in error, plaintiff below, gave six instructions to the jury, all of which were objected to by plaintiff in error, except No. 6; and the plaintiff in error, defendant below, asked for five instructions, to each of which defendant in error objected, and Nos. 1 and 2 were refused and Nos. 3, 4, and 5 amended. The court also, of its

own motion, gave two instructions, to the first of which plaintiff
in error excepted, and after this ruling plaintiff in error asked
for instructions Nos. 6 and 7, to which no objection was made,
and they were also given.

Instructions Nos. 1 and 2, asked by defendant in error, are
as follows:

### Instruction No. 1.

"If the jury believe from the evidence that W. J. Cheatwood
came to his death by being crushed between the tender of an
engine and the sand-house of the Norfolk & Western Railway
Company, located dangerously near the coal wharf track of said
railway, if they believe from the evidence it was so located, on
its yard at East Radford, and at the time of the injury he was
riding on said tender in the course of his employment at his post
of duty, and was injured without fault on his part, they must
find for the plaintiff and assess her damage accordingly, al-
though they may believe from the evidence that plaintiff knew
of the location of said sand-house with reference to said track."

### Instruction No. 2.

"The jury are further instructed that it was the duty of the
defendant company to use reasonable care to furnish to plain-
tiff's intestate a reasonably safe place in which to work and
reasonably safe appliances, machinery, ways and structures, and
the knowledge by said intestate, W. J. Cheatwood, of the defec-
tive or unsafe character or condition of any machinery, ways,
appliances or structures shall be no defense to an action for an
injury caused thereby, such as an injury resulting from a sand-
house being located too near to its railway track, when running
engines and tenders of the size of engine and tender No. 771,
should the jury believe from the evidence that the said sand-

house was located too near the said track and was for that reason
unsafe."

The chief objection urged to No. 1 is that there was no evi-
dence on which to found the second proposition contained
therein, to-wit: that Cheatwood at the time of his injury was at
his post of duty.

We do not think that this is a valid objection to the instruc-
tion, as there was abundant evidence, as we shall see when we
come to review it, tending to show that Cheatwood was at his
post of duty, and certainly enough to submit the question to the
jury, which was in fact the purport and effect of the instruction.
The term in the instruction "dangerously near the track" was
to be considered in the light of the evidence, and while there
was in fact no defect in the construction of the tender or sand-
house, the question submitted to the jury was whether or not the
situation had been made dangerous by the enlargement of the
tender upon which Cheatwood was riding, known to plaintiff in
error but not to Cheatwood, and when the instruction was read
in connection with the other instructions it was not open to the
objections which plaintiff in error makes to it.

It is conceded that the first part of instruction No. 2 correctly
defines a master's duty in furnishing appliances and structures.
It then states that the servant's knowledge of the defects is no
defense to an action for injuries caused thereby, and it was
clearly the purpose of the instruction to tell the jury that it was
negligence to run such an engine as No. 771 by the sand-house,
if they believed from the evidence that the sand-house was
located too near the track, and was for that reason unsafe. Here
again the instruction was to be interpreted in the light of the
evidence, which tended to show the negligence of plaintiff in
error in placing upon its yard to be handled by its employees an
engine of so much larger size than that which Cheatwood and
other employees had been in the habit of handling that it ren-

dered the situation unsafe, while without this change of the size of the tender which Cheatwood was called upon to handle on the night of the 10th of July, the sand-house was not dangerously near the track.   The evidence was all sufficient to justify the giving of the instruction.

The court is further of opinion that there was no error in giving the 3rd and 4th instructions asked for by defendant in error, which are as follows:

### Instruction No. 3.

"If the jury believe from the evidence that plaintiff's intestate, in the proper discharge of his duty, was accustomed to ride engines and tenders through the space between the sand-house and track in question in safety, and that the defendant company without notice to him, caused him to ride, on the night he was injured, an engine with a tender broader than engines and tenders he had been accustomed to handle, and which increased the danger, and thereby made it unsafe to ride said engine by said sand-house to him when so riding, and that this was the proximate cause of his death, without fault upon his part, then the jury must find and assess damages for the plaintiff."

### Instruction No. 4.

"If the jury believe from the evidence that for years the switching or Assistant Hostler, Cheatwood, of the Norfolk & Western Railway Company, all the years at Radford, had been safely riding engines and tenders by this sand-house, moving and headed in the same direction as was the engine and tender on the night of July 10, 1903, W. J. Cheatwood received the injuries which caused his death, and believe from the evidence that said Cheatwood had had no instructions not to ride on the

step of the tender when passing said sand-house, and that he had no instructions where to ride, and that there was no rule of the company applicable to his position in the performance of his duties, and that standing in that position he could most conveniently and with greatest dispatch for said railroad company perform the duties pertaining to his position; and further believe from the evidence that he was at his proper place for the performance of his duties, and without notice to said Cheatwood said company widened some of its tenders so that a man standing in the position on said step at the side of said tender, where said Cheatwood had been accustomed to stand, could not pass said sand-house without being injured or killed; and that in the due and proper performance of his duties, using ordinary care therein, he attempted to ride said tender by said sand-house on the night in question, and in doing so received the injuries which caused his death, then they must find for the plaintiff, although they may believe from the evidence he had knowledge of the distance and location of said sand-house, with reference to said track."

Instruction No. 5 given for the defendant in error, is as follows:

### Instruction No. 5.

"The jury are instructed that if they find damages for the plaintiff; in ascertaining such damages, they should find the same with reference, first: to the pecuniary loss sustained by Sallie Cheatwood, his wife, and the three children of W. J. Cheatwood by the death of said Cheatwood, fixing the same at such sum as would be equal to the probable earnings of the said Cheatwood, taking into consideration the age, business capacity, experience, habits, health, energy and perseverance of the deceased, during what would probably have been his lifetime if

he had not been killed.   Second, in ascertaining the probability of life the jury have the right to determine the same with reference to recognized scientific tables relating to the expectation of human life.   Third, by adding thereto compensation for the loss of his care, attention and society to his wife and children. Fourth, by adding such further sum as they may deem fair and just by way of solace and comfort to said wife and children for the sorrow, suffering and mental anguish occasioned to them by his death."

The instruction is in a form which has been repeatedly passed upon by this court, as is conceded by plaintiff in error, and the objection made to it is that it told the jury that they should give the probable earnings of the deceased during what would have probably been his lifetime but for the accident, and states as the rule that they should find, as the capital to be invested, all that a man would probably earn in a lifetime, without deducting for his expenditures and with only guess work as to his health. The instruction is practically the same as an instruction approved by this court in *B. & O. R. R. Co.* v. *Weightman's admr.,* 29 Gratt. 431, 26 Am. Rep. 384; and again sanctioned in *B. & O. R. R. Co.* v. *Noel,* 32 Gratt. 394, and *Portsmouth St. R. Co.* v. *Peed,* 102 Va. 662, 47 S. E. 850; and in addition to this sanction of the instruction we do not feel warranted in holding that it was not a proper instruction when it is not claimed in this case that the verdict found by the jury is excessive.

This brings us to a consideration of the instructions of plaintiff in error refused by the trial court, or modified and given as modified.

Instruction No. 1 involves a construction of Section 162 of the Constitution of Virginia and the Act of Assembly approved March 27, 1902, (Acts 1901-02, p. 335, Code, [1904] sec. 1294 K.), which provide that "knowledge by any railroad employee injured of the defective or unsafe character or condition

of any machinery, ways, appliances or structures shall be no defense to an action for injury caused thereby." Instruction No. 1 was to the effect that nothing contained in this constitutional provision or in the Act of Assembly, prevented plaintiff in error from making the defense of contributory negligence in the same manner and to the same effect as it could have done if such section and act had not been adopted; and if Cheatwood's death was caused by his own neglect they must find for the defendant.

This provision of the Constitution was taken verbatim from the Constitution of the State of Mississippi, and when adopted by our late Constitutional Convention it had been construed by the Supreme Court of Mississippi in the case of *Buckner* v. *R. & D. R. R. Co.*, 72 Miss. 873, 18 South. 449, in which case a servant was injured by defective machinery and his contributory negligence. It was in that case claimed that the Constitution of Mississippi abrogated the defense of contributory negligence, but the court held otherwise, and after quoting the constitutional provision said: "The effect of this is not to destroy the defense of contributory negligence by a railroad company, but merely to abrogate the previously existing rule that knowledge by an employee of the defective or unsafe character or condition of the machinery, ways or appliances, shall not, of itself, bar a recovery. The law was that knowledge by an employee of defective appliances which he voluntarily used, precluded his recovery for an injury thus received. The Constitution destroys that rule, and the mere fact that the employee knew of the defect, is not a bar to recovery; but knowledge by an employee of defects is still an element or factor, and a very important one, in determining whether, with the knowledge he had, he used that degree of caution required in his situation with reference to the appliances causing his injury. The Constitution did not have the effect to free employees of railroad companies from the exercise of ordinary caution and prudence. It does not

license recklessness or carelessness by them, and give them a claim to compensation for injuries thus suffered. They, like others not employees, must not be guilty of contributory negligence, if they would secure a right of action for injuries."

Under the rule laid down by this court in *N. & W. Ry. Co.* v. *Old Dominion Baggage Co.*, 99 Va. 111, 37 S. E. 784, 50 L. R. A. 722, the construction placed on that clause in our Constitution by the Mississippi court must be adopted by this court.

Practically the same words occur in the Constitution of South Carolina, which were construed by the Supreme Court of that State in *Bodie* v. *C. & W. C. Ry. Co.*, 39 S. E. 715, and *Carson* v. *Southern Ry. Co.*, 46 S. E. 525. In the first named of these cases, the court expressly recognized that contributory negligence was a good defense notwithstanding the constitutional provision; and as to the second case it is sufficient to say that it can have no bearing here, as it was not rendered until after the adoption of our present Constitution.

We are of opinion that independently of the rule laid down in *N. & W. Ry. Co.* v. *Old Dom. Baggage Co.*, *supra*, the construction put upon the language of the constitutional provision under consideration, by the Supreme Court of Mississippi is a correct construction.

But we are further of opinion that the instruction No. 1, asked for by plaintiff in error, was properly refused. In addition to the fact that there were other instructions given which clearly stated to the jury that the plaintiff in error had the right to rely upon the defense of contributory negligence, instruction No. 1, refused, was too broad and was therefore calculated to confuse and mislead the jury.

While the right to make the defense of contributory negligence is not abrogated by the constitutional provision and the statute under consideration, the defense cannot rest alone upon the knowledge of an injured employee of the defective or unsafe

character or condition of any machinery, ways, appliances or structures, which may have been instrumental in causing the injury for which he sues, but such knowledge is rightly to be considered by the jury along with all the evidence in the case in determining whether the employee injured used that caution required in the situation he was placed in when the injury was received. Before the adoption of the constitutional provision and the statute, knowledge by an employee of the defective or unsafe character or condition of any machinery, ways, appliances or structures which were instrumental in causing the injury sued for, upon the doctrine of assumed risk based on knowledge, actual or imputed, arising from the contract between the parties, the law implied that the servant assumed the risk of all danger of which he had knowledge, or by the use of proper diligence would have had knowledge, and therefore did not permit a recovery for an injury arising from defective machinery, ways, appliances, etc., where the defect was known to him. But not so now. The difference between assumed risk, actual or imputed, and contributory negligence arising from matters *ex delicto* and consisting of wrong doing, has been aptly expressed as "using a known defective appliance carefully, and using a good appliance carelessly." An interesting and exhaustive discussion of the cases on this subject, both where the distinction was made, and where it was lost sight of, may be found in the case of *St. Louis Cordage Co.* v. *Miller*, 126 Fed. Rep. 495, 61 C. C. A. 477, 63 L. R. A. 551, and they are also fully discussed in *Bodie* v. *R. R.*, *supra*. So, as we have said, an instruction which tells the jury that the defense of contributory negligence could be made in the same manner and with the same effect as if the constitutional provision and act under consideration had never been adopted, which is in effect to say that the defense is unaffected, is too broad, and therefore well calculated to confuse and mislead the jury.

In the case at bar, the court, at the instance of the plaintiff in error, by instructions Nos. 6 and 7, told the jury that plaintiff in error had the right to make the defense of contributory negligence, although they might believe from the evidence that the location and construction of the sand-house and tender rendered the place defective and dangerous, and that a party is guilty of contributory negligence when he does something he ought not to have done, or omits to take some precaution which he ought to have taken under the circumstances. These instructions fully preserved to plaintiff in error the right to make the defense of contributory negligence.

Plaintiff in error's instruction No. 2, refused, was as follows:

"The defendant company was not bound to move the structures on the side of its track merely because it widened its engines or tenders so long as there was space for them to pass in safety, and reasonable means existed or were provided for its employees to pass such structures in safety while performing their duties, although it may have been more inconvenient for them to use such means as they did use before the widening of the engines or tenders."

The fatal objection to this instruction is that, in directing the jury to consider whether the plaintiff in error had provided other safe places where Cheatwood might have in safety ridden upon the engine on the occasion of the accident to him, it ignored all consideration of the question, whether such other safe places were known to Cheatwood. Cheatwood could not be held guilty of knowingly riding in an unsafe place instead of in a safe place provided for him by his employer, unless conscious at the time of the danger of the position he was taking, and of the safe position provided for him, and where that is the situation the rule of law laid down in 2 Thomp. on Neg. 1059; *C. & O. Ry. Co. v. Sparrow*, 98 Va. 644, 37 S. E. 202; *Street's admr. v. N. & W. Ry. Co.*, 101 Va. 746, 45 S. E. 284, that where there are

two ways to do a thing, one dangerous and the other safe, both open to the servant, it is his duty to use the safe way, although it is not as convenient as the other way, and which rule is invoked by plaintiff in error, has no application.

Plaintiff in error's instructions Nos. 3 and 4, as presented, told the jury that the fact (if it was proved) that Cheatwood had ridden safely on the steps of tenders through a space so narrow they could barely pass through, and of which he had been warned because of the danger, did not justify him in assuming that he could do so on another tender which was larger and of different construction; but they fail to preserve for the consideration of the jury the question, whether or not Cheatwood knew that the tender in question was larger and different, or could by ordinary care have known it. This fatal defect in the instructions was obviated by the amendments thereto made by the court, which were entirely proper.

These instructions Nos. 3 and 4, as amended by the court (the amendments appearing in italics), are as follows:

### No. 3.

"The jury are instructed if they believe from the evidence that William Cheatwood had ridden safely by the sand-house while standing on the steps of the tenders of smaller size and different construction from the one on which he was riding when injured, and believe that on the smaller tenders there was barely sufficient room for him to pass, by being careful to stand close to the side of the tender, and that he had been warned that it was dangerous for him to do so, the fact that he had so ridden did not justify or excuse him for undertaking to ride by the sand-house on the step of a larger tender of different construction, *if he knew that it was larger*, and if they believe that he attempted to do so and was killed in such attempt they must find for the defendant."

## No. 4.

"A person who has been accustomed to ride through a narrow place when there is just enough room for him to get through on tenders or engines which he was accustomed to, cannot attempt to ride through the same space upon a new and different engine or tender of different construction, on the supposition that it is no wider than those he has been using and throw the loss on his employer in case he is injured by reason of its being wider, *unless he knew it was wider and different, or by reasonable and ordinary care might have known of it,* and if the jury believe that William Cheatwood made such attempt and was killed while doing so, they must find for the defendant, and this rule is not changed although they may believe that he did so because he was not thinking what he was doing."

The court also very properly amended plaintiff in error's instruction No. 5, in the same respect, and this instruction, as amended, is as follows:

"If the jury believe from the evidence that there were places on the engine or tender provided for that purpose, *known to him,* where William Cheatwood could have stood and performed his duties in safety, and believe that he had been warned against riding on the tender next to the sand-house, because it was dangerous to do so, and that he was killed while attempting to ride by the sand-house on a tender, they must find for the defendant, although the position taken by him was the most convenient one."

The instructions given by the court, *ex mero motu,* are as follows:

### Court's Instruction No. 1.

"The court instructs the jury that knowledge by any railroad

employee injured, of any defective or unsafe character or condition of any machinery, ways, appliances or structures, shall be no defense to an action for injury caused thereby; and if the jury believe from the evidence that Cheatwood was so injured by reason of the unsafe condition or character of defendant company's appliances and structures, viz: that the sand-house in question was situated dangerously near the track, and was thereby rendered unsafe to the plaintiff in the performance of his duties as assistant 'hostler,' and if they believe that deceased, Cheatwood, was attending to his accustomed duties, using ordinary care therein, at the time he received the injury which caused his death, they must find for the plaintiff, notwithstanding they may believe from the evidence that he had knowledge of said unsafe condition or character of the sand-house."

*Court's Instruction No. 2.*

"The court instructs the jury that these instructions are to be read together, and construed in the light of each other."

The instructions in the case have been set out above, and the court is of opinion that they fully and fairly presented the legal propositions contended for by the counsel on each side.

This brings us to the consideration of the remaining assignment of error, which is the refusal of the court to set aside the verdict and award a new trial, on the ground that it was contrary to the law and the evidence.

The defendant in error rested her claim for a recovery of damages upon the grounds, (1) That Cheatwood was without fault; (2) that he was at his post of duty, in the only position he could assume to properly and expeditiously perform his duties; (3) that the master knew the place he occupied; (4) that he had safely occupied it for twelve years; (5) that the position on the step of a tender was absolutely safe until the 6,000 gallon ten-

ders were put on; and (6) that he had no notice of the danger or of the change in the size of the tenders.

On the other hand, it was contended by plaintiff in error, (1) That there was no defect or unsafe condition in its tender, sand-house or track, that each and all, severally and collectively, were reasonably safe for the performanċe of all requirements of Cheatwood, if he had made a reasonably and ordinarily careful use of them; (2) that neither his instructions nor duty required him to ride on the step where he was killed, as the selection of the step as his riding place was his own choice; (3) that he had been warned not to occupy that position because it was dangerous; that the warning showed that it was unnecessary to be on the step at that place, and that independently of the warning his observation must have shown him the danger; and (4) that with knowledge of the danger in riding on tenders he was accustomed to, he increased the risk by riding a tender of different construction, without attempt to ascertain whether or not it increased the danger, and was killed because the danger of doing so was materially increased.

With the very full statement of the case made at the outset of this opinion, it is unnecessary to go very fully into a review of the evidence. It unmistakably appears, and by this the negligence of the plaintiff in error is fully established, that the company had no rule specifying where the assistant "hostler" should ride on its engines when performing the duties performed by Cheatwood on the occasion of his injuries; that it was known to plaintiff in error that Cheatwood and others doing a like service were riding on the engines in use on its yard at Radford in the manner and at the places stated above; that in riding upon the engines in use prior to the day of this accident there was barely room for the assistant "hostler" to ride upon the step of a tender in safety by the sand-house situated near the track; that with full knowledge of these facts a 6,000 gallon tender was

brought upon the yard in the night time, and Cheatwood was called upon to handle it as he had handled other engines, without any notice whatever to him of the change in the size of the tender, and without any opportunity on his part to have known this fact. The engineer who was running the engine to which this 6,000 gallon tank was annexed testifies that he did not know that he had a larger tank until after Cheatwood had been injured; that it would have required a very close inspection to have discovered the change which had been made; and in effect, it was impossible for Cheatwood, in the night time and under the circumstances, to have known of the increase in the size of the tender, and the necessarily increased danger brought to him by the change of tenders. Upon the question whether or not Cheatwood was at his post of duty, the evidence briefly stated is as follows: That it was his duty to adjust the switches for the "hostler," the "hostler" being the man in charge of the engine; that he was at the place most convenient for him and the engineer; that he was at the time of the accident at the post that he and other assistant "hostlers" had been assuming to perform their duties, which was on the steps at both ends—on the head when going west and on the tank or tender coming east, backing; that Cheatwood had for twelve years been performing this duty, passing by the sand-house upon the engines or tenders for twelve years without injury; that the post he occupied was where he could best discharge the duty immediately in hand, with due regard to his own safety and the business of the company. Three witnesses experienced in the work on the yard at Radford, all of them employees of the plaintiff in error, and one of them, McGee, who was running the engine No. 771 on the occasion of this accident, testify that the duties performed by Cheatwood could best be done when backing with the tender in front, by standing on the step of the tender on the side of the engineer. In answer to the question, "Was there another place

on this tender provided for him to ride that you know of?" one of the three witnesses referred to answered, "No, sir, not that I know of. I never saw anyone ride anywhere else except on the tender." "Q. Except on the tender you mean?. A. Yes, sir." This witness, who states that he had been on that yard for thirteen years, was asked if the place occupied by Cheatwood on the occasion of this accident to him was the best place for him to perform his duties, and answered, "Yes, sir, according to my judgment." Another of the three witnesses referred to was asked, "In the proper performance of his duties, due regard being had to facilitating the business of the company as well as to the safety of the man, to discharge those duties, where was the best place for a man to stand to perform them—I mean as assistant 'hostler'?" to which he answered, "Well, both for his own advantage and that of the man he was working with, it was best to stand on the step. It was in a manner to push the business along and as much to their interest (meaning the company) as to that of the man." The same witness states, "that was the post they had been assuming to perform that duty; that was on the step at both ends—on the head when going west, and on the tank coming east, backing."

According to these and other witnesses, to sum up, the following facts appear: (1) That the position occupied by the deceased, Cheatwood, was the necessary, usual and proper position occupied by the assistant "hostler"; (2) that he could in that position best perform the duties required of him by the master; (3) that employees always rode in that position, unless it was storming; (4) that he could not properly attend to his duties in any other position which was as safe as that one; (5) that the position occupied by him was well known to the master; (6) that he had safely ridden in that position for from twelve to twenty years on all tenders known or handled by him prior to the 10th of July, 1903, when he received his fatal injuries; (7) that it was the first time an engine with a tender of that size

and headed as that one was taken by Cheatwood, the deceased, to the coal-wharf by the sand-house; (8) that Cheatwood was called to assist with this engine in the night time, and that he did not know, nor by the exercise of ordinary care could he have known, that he was handling an engine with a tender larger than those he was accustomed to riding; (9) that he was given no notice of the change in the size of the tender, or the altered condition of the ways; (10) that he had no instructions as to the position he should occupy on a tender and engine; (11) that on the tender upon which he was sent on the night of July 10, a man standing in the position he was accustomed to occupy could not, with ever so great care, possibly pass by the sand-house without receiving fatal injuries; (12) that it was difficult to get upon the end sill at the end of the tender, that when there it was a dangerous position, more so than that on the step, and difficult to maintain, and that one in that position could not well perform the duties required of him; and (13) that the steps were the safer place for him to occupy as compared with the sill at the end of the tender where it is claimed that he could have ridden with greater safety; in fact until the introduction, on the night of July 10 for the first time, of the 6,000 gallon tender, the step upon which Cheatwood was riding was a perfectly safe place.

The situation then was this: The plaintiff in error had no rules prescribing where its servants should ride on its engines and tenders, when performing the duties of an assistant "hostler" on the yard at Radford. It knew that its servants, performing these duties, had for years been in the habit of riding upon the engines and tenders run over the yard in the manner and places heretofore stated. It knew that it was impossible for an assistant "hostler" to ride upon the step of a six thousand gallon tender, running backwards, over the yard by the sand-house situated near the track over which the engine and tender must necessarily pass, without certain injury or death to the assistant

"hostler"; yet it permitted a tender of that size to be run over the yard in the night time on July 10, 1903, without any warning to those whose duty it was to handle it, and in consequence of this negligence on its part Cheatwood received injuries resulting in his death. Bearing in mind, as is conceded in the argument here, that the evidence does not show that Cheatwood and others repeatedly rode past the sand-house on the steps of five thousand gallon tenders, and in fact does not show that Cheatwood ever rode on the step of a tender of that size by the sand-house, can it be said, in the face of the testimony of the "hostler" in charge of engine No. 771 on the night of July 10, and with whom Cheatwood had worked for five years preceeding, to the effect that it would have taken very close inspection to have discovered the fact that the tender attached to the engine on that occasion was larger than those formerly handled on the yard, that Cheatwood knew or by the exercise of ordinary care and prudence could have known that it was a larger tender than those he had formerly been handling, and that he could not with safety ride on its steps by the sand-house, when in fact the "hostler" himself did not know the tender was larger until after Cheatwood had been mashed at the sand-house? We think, as did the jury, that the question must be answered in the negative.

"No servant is presumptively chargeable with notice of a peculiar and unusual state of things. Reasonable time must be allowed to a new servant to become acquainted with his surroundings, and to an old servant to learn of changes in the situation. Servants are presumed to be aware of defects which are perfectly obvious to their sight, and the danger of which is obvious to any person of their mental capacity. But to charge them with notice on this ground, the defect and danger must be unquestionably plain and clear, so that, if they did not see it, they must necessarily have been in fault." 1 Shearman & Red. on Neg., sec. 216.

The warning which it is claimed that Cheatwood had consisted merely in McGee, the "hostler" with whom he was working, saying to Cheatwood, "maybe a year or two before he was killed . . . 'If I was in your place I would not ride the tanks through there,' and I told him I thought it was dangerous." In view of the fact that it does not appear when these remarks were made to Cheatwood, and that the same witness, McGee, as well as others, testify that they never saw Cheatwood ride a 5,000 gallon tank by the sand-house, but knew that he, as well as others, had been riding the smaller tanks by there regularly for years previous, no importance is to be attached to this so-called warning. Nor do we concur in the view of counsel for plaintiff in error that the answer to the question asked Cheatwood the morning after his injuries—"Why on earth did you ride that big engine through there?" to which Cheatwood replied, "I don't know why. I had been riding those hogs; wasn't thinking what I was doing"—should be taken as an admission by Cheatwood that he knew that the tender which he was called upon to handle on the night of July 10 was larger than the tenders that he had theretofore been handling on the yard. When saying "I had been riding those hogs," he must have had reference to the four thousand gallon tenders upon which he had ridden with safety for a great number of years previous, as neither of the witnesses who testified on this point, and who were employees on the yard with Cheatwood, could say that they ever saw him ride on the steps of a five thousand gallon tender by the sand-house. Nor can any importance whatever, as it seems to us, be attached, under all the circumstances, to that part of Cheatwood's answer to the same witness, viz: "I wasn't thinking what I was doing."

Upon the whole case, we are of opinion that the judgment of the Corporation Court of Radford should be affirmed.

*Affirmed.*