## Wytheville.

NORFOLK AND PORTSMOUTH TRACTION COMPANY v. ELLINGTON'S ADMINISTRATOR.

108 245
f110 850
f110 852
e110 861

June 11, 1908.

1. PLEADING—*Declaration—No Evidence to Support.*—Where there is no evidence to support a count in a declaration, it is proper to instruct the jury to disregard such count.

2. MASTER AND SERVANT—*Safe Appliances—Selection—Negligence.*—It is the duty of the master to use ordinary care to provide his servant with reasonably safe and suitable appliances and instrumentalities for the work to be done, but the right of selection among reasonably adequate and safe methods and instrumentalities rests wholly with the master. He is not required to furnish the newest and best, but only reasonably safe. He is liable for the consequences of negligence but not of danger, and the unbending test of negligence in methods, machinery, and appliances is the ordinary usage of the business. The standard of due care is the conduct of the average prudent man.

3. EVIDENCE—*Experts—Opinions.*—One who has been a conductor and motorman on electric cars for eight years, but who is without experience in the construction of cross-over trolleys is not an expert as to the proper method of constructing such cross-overs, and hence cannot give his opinion on the subject.

4. STREET RAILWAYS—*Fellow-Servant Doctrine—"Railroad Company."*—The provisions of section 162 of the Constitution of this State abolishing the doctrine of fellow-servant as to employees of railroad companies does not apply to employees of electric street railway companies, but as to the latter the common law fellow-servant doctrine still obtains. The words "railroad company" as employed in that section were only intended to apply to railroads proper, or commercial railroads. The language of the Constitution and of the statute passed in pursuance thereof, and the history and reason of these provisions indicate that street railways were not intended to be embraced.

Error to a judgment of the Circuit Court of Norfolk county, in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The plaintiff in error seeks to reverse a judgment of the Circuit Court of Norfolk county in an action brought against it by the defendant in error to recover damages for the death of his intestate, John T. Ellington, a motorman on one of its electric cars.

The accident in which Ellington lost his life occurred about half-past eleven o'clock on the night of August 21, 1906, and was the result of a collision between two of the company's cars in a suburb of the city of Norfolk, on a cross-over or latch, connecting the company's double tracks with its car barn. Ellington's car, which he was attempting to convey from the western track across the eastern track to the car barn to be housed for the night, was run into by another car on the eastern track and derailed, the effect of the impact being that Ellington was thrown from his car to the ground and fatally injured.

The scene of the accident is well described in the petition for a writ of error as follows: "Church street, just outside of the corporate limits of the city of Norfolk, runs nearly north and south. At the point where the accident occurred on this street, the Norfolk and Portsmouth Traction Company has two tracks, the easternmost of which is used by cars going north-wardly to the City Park, while the westernmost track is used by cars going southwardly toward Main street in Norfolk. * * * At a short distance south of C street, which runs east and west and comes into Church street, there is a cross-over, or latch, connecting the two tracks with the car barn of the company, situated on the east side of Church street, a little north of C street."

There was no overhead trolley wire over the cross-over, and in order to effect a crossing it is necessary to stop the car at

a point south of the switch on the west track. The motorman then takes the controller handle off the controller on the northern end of the car and transfers it to the controller on the southern end, while the conductor reverses the trolley; and upon his giving the bell signal to go ahead, it becomes the duty of the motorman to put the car in motion at a sufficient rate of speed to carry it across the latch by its own momentum. When the trolley wheel leaves the overhead wire, the electric current is shut off, and the car passes over the latch in darkness.

Among other matters, which sufficiently appear from the opinion of the court, the case involves the determination of the question, whether section 162 of the Constitution of Virginia abolishes the fellow-servant doctrine among employees of street railway companies. The section is here inserted in full.

"The doctrine of fellow-servant, so far as it affects the liability of the master for injuries to his servant resulting from the acts or omissions of any other servant or servants of the common master, is, to the extent hereinafter stated, abolished as to every employee of a railroad company, engaged in the physical construction, repair or maintenance of its roadway, track or any of the structures connected therewith, or in any work in or upon a car or engine standing upon a track, or in the physical operation of a train, car, engine, or switch, or in any service requiring his presence upon a train, car or engine; and every such employee shall have the same right to recover for every injury suffered by him from the acts or omissions of any other employee or employees of the common master, that a servant would have (at the time when this Constitution goes into effect), if such acts or omissions were those of the master himself in the performance of a non-assignable duty: provided, that the injury, so suffered by such railroad employee, result from the negligence of an officer, or agent, of the company of a higher grade of service than himself, or from that of a person, employed by the company, having the right, or charged with the duty, to control or direct the general services or the

immediate work of the party injured, or the general services or the immediate work of the co-employee through, or ·by, whose act or omission he is injured; or that it result from the negligence of a co-employee engaged in another department of labor, or engaged upon, or in charge of, any car upon which, or upon the train of which it is a part, the injured employee is not at the time of receiving the injury, or who is in charge of any switch, signal point, or locomotive engine, or is charged with dispatching trains or transmitting telegraphic or telephonic orders therefor; and whether such negligence be in the performance of an assignable or non-assignable duty. The physical construction, repair or maintenance of the roadway, track or any of the structures connected therewith, and the physical construction, repair, maintenance, cleaning or operation of trains, cars or engines, shall be regarded as different departments of labor within the meaning of this section. Knowledge, by any such railroad employee injured, of the defective or unsafe character or condition of any machinery, ways, appliances or structures, shall be no defense to an action for injury caused thereby. When death, whether instantaneous or not, results to such an employee from any injury for which he could have recovered, under the above provisions, had death not occurred, then his legal or personal representative, surviving consort, and relatives (and any trustee, curator, committee or guardian of such consort or relatives) shall, respectively, have the same rights and remedies with respect thereto as if his death had been caused by the negligence of a co-employee while in the performance, as vice-principal, of a non-assignable duty of the master. Every contract or agreement, express or implied, made by an employee, to waive the benefit of this section, shall be null and void. This section shall not be construed to deprive any employee, or his legal or personal representative, surviving consort or relatives (or any trustee, curator, committee or guardian of such consort or relatives), of any rights or remedies that he or they may have by the law of the land, at the time this Con-

stitution goes into effect. Nothing contained in this section shall restrict the power of the general assembly to further enlarge, for the above-named class of employees, the rights and remedies hereinbefore provided for, or to extend such rights and remedies to, or otherwise enlarge the present rights and remedies of, any other class of employees of railroads or of employees of any person, firm or corporation."

*Henry W. Anderson* and *Williams & Tunstall,* for the plaintiff in error.

*R. Randolph Hicks* and *Smith, Moncure & Gordon,* for the defendant in error.

WHITTLE, J. (after making the foregoing statement), delivered the opinion of the court.

There are four counts in the declaration. The first count alleges that the defendant was guilty of negligence in not having an overhead trolley wire over the cross-over. The second count charges the defendant with negligence in failing to adopt adequate rules for the protection of employees using the cross-over. The third count charges negligence on the part of employees in charge of the colliding car. And the fourth count attributes negligence to Frieheit, the conductor on Ellington's car.

The first and second assignments of error are to the refusal of the circuit court to instruct the jury to disregard the first and second counts of the declaration, because there was no evidence to support them.

Both assignments are well taken. With regard to the first assignment, the doctrine is settled in this State, by an unbroken line of decisions, that the law only imposes upon the master the duty of using ordinary care to provide the servant with reasonably safe and suitable appliances and instrumentalities for the work to be done; but the right of selection among reasonably

adequate and safe methods and instrumentalities rests wholly with the master; and, moreover, he is not required to furnish the servant with the newest and best appliances. These principles have been iterated and reiterated by this court until they have attained the dignity of established principles in the jurisprudence of the State.

The rule is clearly stated in *Bertha Zinc Co.* v. *Martin,* 93 Va. 791, 807, 22 S. E. 869, 70 L. R. A. 999, where, quoting from *Titus* v. *Railroad Co.,* 136 Penn. St. 618, 626, 20 Atl. 517, 20 Am. St. Rep. 944, it is said: "All the cases agree that the master is not bound to use the newest and best appliances. He performs his duty when he furnishes those of ordinary character and reasonable safety, and the former is the test of the latter; for in regard to the style of the implement or nature of the mode of performance of any work, 'reasonably safe' means safe according to the usages, habits and ordinary risks of the business. Absolute safety is unattainable, and employers are not insurers. They are liable for the consequences, not of danger, but of negligence; and the unbending test of negligence in methods, machinery and appliances is the ordinary usage of the business. No man is held by law to a higher degree of skill than the fair average of his profession or trade, and the standard of due care is the conduct of the average prudent man. The test of negligence in the employers is the same, and however strongly they may be convinced that there is a better or less dangerous way, no jury can be permitted to say that the usual and ordinary way, commonly adopted by those in the same business, is a negligent way for which liability shall be imposed. Juries must necessarily determine the responsibility of individual conduct, but they cannot be allowed to set a standard which shall, in effect, dictate the customs or control the business of the community." See also *McDonald* v. *N. & W. Ry. Co.,* 95 Va. 98, 105, 27 S. E. 821; *Riverside Cotton Mills* v. *Green,* 98 Va. 58, 34 S. E. 963; *N. & W. Ry. Co.* v. *Cromer,* 101 Va. 667, 671, 44 S. E. 898; *Truckers Manufacturing & Supply Co.* v. *White,* *ante,* p. 147.

The burden was upon the plaintiff to prove the negligence of the company, and this he attempted to do, not by showing that the method used by the company was not a reasonably safe method, but that in the opinion of a witness, who had been a conductor and motorman on electric cars off and on for eight years, a cross-over trolley would be a simple and inexpensive device for promoting the safety and convenience of the company and its employees. The witness admitted that he had never had any experience in superintending the construction of such work; and, while he did not consider himself an expert in those matters, he believed that with a little experience he could do the work, "but could not jump into it on the street."

It appeared that every night, from about 11:30 until about 12:30 o'clock, an average of a car a minute crossed this latch; and there was no evidence tending to show that any such accident had ever happened before at that point, or elsewhere, from the use of such contrivance. Under these circumstances, the unreasonableness of condemning a method which experience had shown to be reasonably safe, and fixing negligence upon the company for its employment, on the bare opinion of an alleged expert witness, the foundation of whose special knowledge was that he had formerly served in the capacities of motorman and conductor on electric cars, must be manifest.

The testimony of the witness was objected to on the ground that he was not qualified to give an expert opinion on the matter under investigation. The objection was well taken, and ought to have been sustained.

In *McKelvey* v. *C. & O. Ry. Co.*, 35 W. Va. 500, 14 S. E. 261, it was held that a locomotive engineer, without experience in the construction and repair of boilers, was not an expert as to the effect of broken stay-bolts in the boiler. The court, in that connection, observes: "Every one may, it is true, have an opinion from observation, but it is an untrustworthy opinion, not ranking in reliability as that of one proficient in the art of its construction. This witness had simply used engines as an engi-

neer, and had, perhaps, become acquainted with the practical working of some of their parts, but that is all. He shows himself that he is not an expert."

Says Wigmore: "It is desirable to appreciate that expert capacity is a matter wholly relative to the subject of the particular question; that therefore the existence of the capacity arises in theory as a new inquiry from question to question." Greenleaf on Ev. (16th ed., by Wigmore), sec. 430a.

With respect to the allegation of the second count of the declaration, that the company negligently failed to adopt and promulgate adequate rules for the protection of its employees in crossing the latch, the only evidence on the subject was supplied by the plaintiff's witness, who testified that "employees were instructed to lookout when using the cross-over to see that there was nothing approaching."

In that state of the evidence, the jury should have been told not to consider the second count, and ought not to have been left to conjecture that the company might possibly have adopted some other rule better calculated to insure the safety of employees.

We approach, with a just appreciation of its importance, the consideration of the question raised by the third and fourth assignments of error, namely: Whether section 162 of the Constitution of Virginia abolishes the fellow-servant doctrine, so far as employees of street railway companies are concerned.

Though this question is one of first impression in this State. It has been passed on by the courts of last resort of several of the States of the Union; and it may be confidently affirmed, that, by the great weight of authority, street railways or noncommercial roads are not included within the scope of similar enactments.

It has been said, that "The word 'railroad' has no such fixed definition as to enable a court to determine whether, by its mere use in a statute, it applies to street railways or not. It may be used in its broad sense, which includes a street railroad and any

other kind of road on which rails of iron are laid for the wheels of cars to run upon, whether propelled by steam, electricity, horse or other power; or it may be used in its technical sense, which does not apply to street railroads.  As a general rule, statutes are presumed to use words in their popular sense; but the safest rule of construction is to take the entire provisions of the statute and thereby ascertain, if possible, what the legislature intended.  The meaning must depend upon the context, and be ascertained from the occasion and necessity of the law, the mischief felt, and the object and remedy in view." *Mass. Loans &c.* v. *Hamilton,* 88 Fed. 589, 32 C. C. A. 46.

That case came from the Western District of Montana, and the United States Circuit Court of Appeals held that a statute providing that judgments for certain torts might be recovered against "any railway corporation," did not apply to street car companies, for the reason that other provisions of the same statute applicable to "any railway corporation" were plainly not applicable to street car companies.

If, therefore, it be conceded that the word "railroad," in its broadest signification, would include both street railways and steam railroads, nevertheless a critical examination of the language of section 162, and other portions of the Constitution and laws of the State *in pari materia,* aided by the history and spirit of the provision, lead to the conclusion that the words "railroad company," as employed in that section, were only intended to apply to railroads proper, or commercial railroads.

Thus, it will be seen, that section 162 refers to employees of railroads at work "upon a car or engine standing upon a track;" and gives right of action to a servant injured by the negligence of an employee "in charge of any switch, signal point, or locomotive engine, or who is charged with dispatching trains or transmitting telegraphic or telephonic orders therefor."  This language is not applicable to street railways; they are not propelled by locomotive engines, nor are their movements controlled by train dispatchers or telegraphic orders.

In construing a Massachusetts statute which made an employer liable for injuries to an employee resulting from the negligence of a fellow-servant in charge of a "locomotive engine or train upon a railroad," the Supreme Judicial Court of that State, in *Fulton* v. *Westend Street Railway Company*, 171 Mass. 249, 50 N. E. 536, held, that a street railway operated by electricity was not within the meaning of the act.

Again, section 153 of the Constitution declares, that "The term 'transportation company' shall include any company, trustee, or other person, owning, leasing or operating for hire a railroad, street railway, canal, steamboat or steam line, and also any freight car company, car association, or car trust, express company, or company, trustee or person in any way engaged in business as a common carrier over a route acquired in whole or in part under the right of eminent domain." If the Constitutional Convention had been of opinion that the word "railroad" included "street railway," it would not have found it necessary to mention the latter *eo nomine* in its carefully worded definition of the term "transportation company."

So, in the "act concerning public service corporations," Va. Code, 1904, sec. 1294a, the term "transportation company" is similarly defined, the definition, in terms, naming both "railroads" and "street railways." In the same section, the words "railroads" and "railroad companies" are defined, but there is nothing to indicate that those terms are intended to embrace "street railways" or "street railway companies."

Section 162 of the Constitution of Virginia is the counterpart of section 193 of the Constitution of the State of Mississippi of 1890, from which it was taken. *N. & W. Ry. Co.* v. *Cheatwood*, 103 Va. 356, 366, 49 S. E. 489. Consequently, the decisions of the Mississippi court construing practically an identical provision of the Constitution of that State, and giving in historical review the reasons for its adoption, are entitled to very great weight in interpreting the corresponding section of the Virginia Constitution.

In October, 1902, section 193 of the Mississippi Constitution was construed by the Supreme Court of that State in *Ballard* v. *Cotton Oil Co.*, 81 Miss. 507, 34 South. 533, 95 Am. St. Rep. 476, 62 L. R. A. 407, and a statute of Mississippi, which undertook to extend the provisions of that section to employees of corporations other than railroad corporations proper, or commercial railroads, was condemned as violative of the fourteenth amendment of the Constitution of the United States.

In the case of *Construction Co.* v. *Heflin*, 88 Miss. 314, 42 South. 174, 12 L. R. A. (N. S.) 1040, (decided two years ago) the Ballard case is exhaustively reviewed and its doctrine approved. At page 348, the court says: "What is the plain and simple history of the adoption of this section? We set it forth fully in the Ballard case as follows: 'Sec. 193 of the Constitution of 1890 was adopted after the decision of the United States Supreme Court in *Missouri R. Co.* v. *Mackey*, 127 U. S. 205, 32 L. Ed. 107, 8 Supt. Ct. 1161 in 1888, and was manifestly intended to authorize legislation along the lines held constitutional in that case—that is to say, to abolish the fellow-servant rule in the case of employees of railroad corporations whose business was known to be inherently dangerous—and the purpose of the last clause of sec. 193 was to extend the remedies therein provided for to any other class of employees of corporations or persons whose business was, like that of railroads, inherently dangerous, or whose business was so different from the business of other corporations or persons as to furnish the basis for a classification of the business of such corporations or persons, under which their employees might be permitted to sue without reference to the fellow-servant rule, while the employees of corporations and persons not having that sort of business could not so sue; in other words, to permit a classification based on 'some difference bearing a reasonable and just relation to the act in respect to which the classification is proposed.' *Ellis' Case*, 165 U. S. 150, 41 L. Ed. 666, 17 Sup. Ct. 255." The court then, at page 350 of 88 Miss. proceeds: "There

never was a wiser building than the writing of this sec. 193. * * * They (the Constitutional Convention) did not wish to be 'hoisted by their own petard,' by framing a section which would be wholly stricken down by that great court (the Supreme Court of the United States) ; for knowing the decisions of that court up to that time, as we particularly pointed them out in the Ballard case, they knew that the United States Supreme Court had, in the Mackey case, *supra,* sanctioned legislation giving to the employees of railroad corporations proper—such railroads as are sometimes known as 'commercial railroads,' engaged in the transportation of freight and passengers—remedies denied such employees of other corporations. They knew that that classification had been vindicated upon the ground that the business of such corporations was inherently dangerous. They knew that they might, therefore, follow in the footsteps of the United States Supreme Court in going that far ; and they went that far, for that reason ; and they went no farther, for that very wise reason. And so, as we said in the Ballard case, if it be only correctly and carefully read, the whole scope and purpose and spirit of said sec. 193 of our Constitution is to give the remedies therein given to the employees of railroad corporations proper, such as are engaged in the transportation of freight and passengers, and to such railroad companies alone." Accordingly, the court held that the provisions of section 193 were not applicable to a corporation not a common carrier, although operating a railroad as an adjunct to its main business.

We may also place in that side of the scale, without, however, prolonging this opinion to review them, the following pertinent authorities : *Funk* v. *St. Paul City R. Co.,* 61 Minn. 435, 63 N. W. 1009, 52 Am. St. Rep. 608, 29 L. R. A. 208 ; *Lundquist* v. *Duluth St. Ry. Co.,* 65 Minn. 387, 67 N. W. 1006 ; *Riley* v. *Galveston City R. Co.,* 13 Tex. Civ. App. 247, 35 S. W. 826 ; *Fallon* v. *Westend St. Ry. Co.,* 171 Mass. 249, 50 N. E. 536 ; *Sams* v. *St. Louis &c. R. Co.,* 174 Mo. 53, 73 S. W. 686, 61 L. R. A. 475.

Against this formidable array, the Supreme Court of Georgia held *contra* in *Savannah, &c., R. Co.* v. *Williams,* 117 Ga. 414, 43 S. E. 751, 61 L. R. A. 249.

We are bound to presume that the able lawyers who framed section 162 knew of the construction placed by the foregoing decisions on similar enactments, and if they had intended that section to embrace street railways, they would have declared that intention in unmistakable language.

The comparative inherent dangers of the respective businesses of railroad companies proper and street railway companies is well illustrated by the following statistics, taken from reports of the State Corporation Commission: In 1903, on steam railroads, out of a total of 2,789 persons killed or injured by accidents, 2,319 were employees. On electric railways, out of a total of 493 persons killed or injured by accidents, nine were employees. In 1904, on steam railroads, out of a total of 2,781 persons killed or injured by accidents, 2,264 were employees. On electric railways, out of a total of 206 persons killed or injured by accidents, nine were employees. In 1905, on steam railroads, out of a total of 1,812 killed or injured by accidents, 1,353 were employees. On electric railways, out of a total of 230 persons killed or injured by accidents, nineteen were employees. And, in 1906, on steam railroads, out of a total of 2,277 persons killed or injured by accidents, 1,775 were employees. On electric railways, out of a total of 203 persons killed or injured by accidents, twenty-seven were employees.

It is also worthy of notice, that while the dockets of this court abound with fellow-servant cases occurring on steam railroads, we recall but one instance of the kind in connection with electric railways.

It would seem, therefore, that the danger is infinitely greater proportionately to employees of steam railroad companies than to employees of electric railway companies; and that consideration may have been a dominant factor with the Constitutional

Convention in including the one class and excluding the other class of employees from the operation of section 162—as was unquestionably the case with the Mississippi Convention.

It may well be that the growing tendency of electric railway companies to extend their lines, not infrequently many miles, out into the country for utilization in the transportation of lighter forms of freight, including all kinds of farm products, as well as of passengers, will necessitate similar classification of such companies with other commercial railroads. Should the exigency arise, the last paragraph of section 162 leaves the legislature freehanded to deal with the situation. But in the present state of the law there is no escape from the conclusion, that under the Virginia Constitution the common law fellow-servant doctrine still obtains with respect to employees of street railway companies.

Our rulings on the preceding assignments of error will necessitate a new trial of the case along such essentially different lines as to render notice of the remaining assignments unnecessary.

The judgment of the trial court must be reversed, the verdict of the jury set aside, and the case remanded for a new trial to be had therein, not in conflict with this opinion.

*Reversed.*