# Staunton.

## E. L. SUTPHIN v. NORFOLK AND WESTERN RAILWAY COMPANY.

September 20, 1928.

The opinion states the case.

*Leo S. Howard, H. C. Tyler* and *John B. Spiers*, for the plaintiff in error.

*Jordan, Roop, Sowder & Dalton* and *F. M. Rivinus*, for the defendant in error.

PRENTIS, C. J., delivered the opinion of the court.

This is an action brought by B. L. Sutphin, who was a laborer employed by the Norfolk and Western Railway Company, against that company, alleging personal injury caused by the defendant's negligence. There was a jury trial, a verdict and judgment for the defendant, and the plaintiff is here alleging several errors.

Stated in general terms, these are the facts: The company has a timber preserving or tie-treating plant at Radford, and as an incident of that work uses about 212 small tram cars. These tram cars were not used on the main line of the road, but there are a number of miles of narrow guage track upon which they are moved. They are first loaded with ties, then placed in position by a small engine, and then pushed by hand into and out of the adzing shop—that is, the place where holes for spikes were bored and grooves for rail plates cut in the ties by the use of an adzing machine. At the time of his alleged injury, the plaintiff, with another of the laborers, was engaged in his usual work of pushing one of these small tram cars loaded with ties a short distance on a straight track into the adzing shop. He had his back to the car, which was not an unusual method of pushing it, and claims that the car was so hard to push that he undertook to brace himself against the end of a tie in the track, which

broke because it was decayed and rotten, and this caused him to fall against the protruding end of one of the ties which was on the tram car, which caused his injury.

According to the plaintiff's testimony, thereafter Dillon, the foreman, who was called by him, with the assistance of three other men, pushed the car into the adzing house, where it was unloaded in the regular way. It is said that Dillon recognized that something was wrong with the car as it was being pushed in, because of the fact that it was not rolling smoothly, but that after it was unloaded it seemed to roll smoothly, and was easily pushed out through the western entrance where he intended that it should go on its regular round. Dillon assumed that there was nothing wrong with the car from the fact that it rolled smoothly after it was unloaded. Plaintiff testified that he observed, as the car was being pushed into the adzing house by the four men, that it had a flat wheel, and so reported to Ratcliffe, who, with the assistance of the plaintiff, removed the wheel after it had passed through the western entrance, where plaintiff saw for the first time that the bearings inside the wheel were broken. He testified that he could not have discovered this defect in the car while it was standing on the track, or while he was endeavoring to move it, by the most careful inspection, but while the car was in motion, the flat wheel could have been easily detected.

It is observed that this tram car is not the ordinary railroad car, but a very simple instrumentality, consisting of a steel frame, somewhat in the shape of an ordinary hay or farm ladder, upon which the ties were loaded and transported into the adzing shed. Plaintiff testifies that he did not assist in pushing the car in after his fall, but that he saw the flat wheel when

Thompson and the others pushed it in, and that Thompson put grease on the track so that the wheel would slide.

There are some inconsistencies between his testimony and that of his own witness, Dillon, who was foreman of the men then working there, and who was called to help push the car. Dillon testified, for instance, that because of the location of the car the plaintiff could not have had his foot against the tie which he testified gave way; that he saw no evidence of a recently broken tie; and that the plaintiff did not claim to him that a tie gave way. This witness also states that the plaintiff himself assisted in pushing the car into the shed, and that it was no unusual thing for cars to be hard to push—some would be hard to push and some easy; that it was the duty of those engaged in pushing cars to report them when in disrepair and to help repair them.

There is a great volume of evidence and a conflict of opinion as to whether the alleged fall could have caused or increased the plaintiff's injury, which a physician, Dr. Giesen, who was first consulted by him a year later, diagnosed as chronic arthritis of the lumbar or lower spine, that is, rheumatism of lower spine, and also neurasthenia, which he construed to be traumatic neurasthenia. It appears that this physician first saw him on the 29th day of September, 1927, the alleged injury occurred on September 30, 1926—and that he went to see Dr. Giesen upon the day his action was instituted—that is, within one day of the time it would have been barred. Dr. Giesen's opinion was that his condition was caused or aggravated by his fall.

There is no contradiction, however, of these additional facts: He continued to work a short while; then was off sick some weeks; then returned to work for about six weeks; was then again laid off as sick, and has

since been receiving his sick benefits from the company. Five days after the occurrence—that is, on October 5, 1926—the plaintiff went to his own physician, Dr. T. C. Harris. Dr. Harris testified that when plaintiff came he looked sick, and was complaining of a terrible pain in his stomach, and on being questioned said he had been sick for several days; that he had been vomiting on that particular day; his bowels being upset; that he had never had an attack like that, etc.; that he had had a good deal of indigestion, gas, etc., and also had constipation for some time; that on that day he had a temperature of $102\frac{1}{2}°$, a quick pulse and very bad tongue. He was stretched on a couch and examined. This physician diagnosed the case as acute appendicitis, advised the patent to go to bed, and if he did not get better to come back to the office or to send for him. The plaintiff said nothing about his having had a fall from which he had received an injury, and did not complain of his back at all. October 7, two days later, he returned, was very much better, and the physician thought the attack would probably pass away and clear up, as such a course is not unusual in appendicitis cases. He was still very tender over the appendix, but his rigidity had disappeared. This witness, Dr. Harris, did not expect to see him any more; thought the attack was over; gave him a tonic and directed a mild laxative. Neither his fall nor injury was then mentioned, nor was any complaint made of any injury to his back. He returned to this physician October 14, when for the first time he described his pain as extending from his right abdomen through his back, around the kidney region. The physician then examined his back and perceived no indication of any injury, and expressed the opinion that a blow sufficient to cause such injury as is claimed in this action would have certainly

left some bruise, though not necessarily an abrasion. On this occasion Dr. Harris concluded that plaintiff was toxic and that he was being disabled by some toxic poison. He returned to this physician October 20, still suffering with pain in his stomach, nausea, etc., and again on October 28, but made no reference to his fall or injury, and Dr. Harris still thought his trouble toxic, and that he had a diseased appendix. Then on November 30 or December 1, which was two months after his fall, when he again came to see the physician, he for the first time said: "All my trouble is due to the hurt I got down on the tie yard."

Another physician, Dr. Whitman, examined the plaintiff in August, 1927. He found several badly diseased teeth and decayed roots, and inflamed and enlarged tonsils from which he expressed pus; constipation over a period of years and some generalized tenderness from the McBurney point. Dr. Whitman concluded that he was suffering from focal infection, the symptoms having localized in the region of the right hip, lower spine and lateral portion of the abdomen. This witness also states that he has treated a great many cases of chronic arthritis of the spine, and that invariably, if the trouble arises from an injury to the spine, the X-ray study will reveal it or show evidence of it. Assuming that arthritis exists, he is of opinion that it is caused by the infection, and that the overwhelming weight of signs point that way. This physician is supported in his diagnosis by Dr. McKinney, an expert on X-ray examination, who took photographs August 26, 1927, and Dr. Grove, a dentist who extracted his teeth a short time before the trial; and these four physicians are fully supported in their opinion by three more, Drs. Weatherly, Johnson and Remsberg.

This being the state of the evidence, of course the verdict of the jury in favor of the defendant is not surprising. It must stand unless some substantial right of the plaintiff was denied him at the trial.

The argument on both sides is elaborate, covers a wide range and discusses questions which may be more or less debatable as abstract propositions. The specific question here emphasized is whether the work being done by the plaintiff at the time, pushing this tram car, was one of the hazards incident to the maintenance, use and operation of steam railroads, referred to in Constitution, section 162, so as to impute to the plaintiff knowledge of the alleged defective appliances, and so with having assumed the risk of using them.

The effect of this section has been discussed by this court in *N. & W. Ry. Co.* v. *Cheatwood, Adm'x*, 103 Va. 356, 49 S. E. 489, in which case it is said: "This provision of the Constitution was taken verbatim from the Constitution of the State of Mississippi, and when adopted by our late Constitutional Convention it had been construed by the Supreme Court of Mississippi in the case of *Buckner* v. *R. & D. R. R. Co.*, 72 Miss. 873, 18 So. 449." This case also refers to the rule that where a constitutional provision or statute of one State is adopted by another State, the construction previously given by the courts of the former State is also adopted, and holds that independently of this rule, the construction of the Mississippi court is the correct construction of the provision.

The question is again treated in the case of *Norfolk & Portsmouth Traction Co.* v. *Ellington's Adm'r*, 108 Va. 245, 61 S. E. 779, 17 L. R. A. (N. S.) 117, and it is there held that section 162 has no application to employees of street reailway companies. In that case this court quotes with approval from *Bradford Con-*

*struction Co.* v. *Heflin*, 88 Miss. 314, 42 So. 174, 12. L. R. A. (N. S.) 1040. This is there said referring to the Mississippi Constitution: "It manifestly never was the purpose of the Constitution makers, in said section 193, to give to all employees of railroad corporations the remedies therein provided. They meant such employees as were imperiled by the hazardous nature of the business of operating railroad trains. The very ground upon which the United States Supreme Court all along held that such legislation was constitutional was that the nature of the business of operating railroad cars is inherently dangerous. It would be absurd to hold that there was any inherent danger in discharging the duties of ticket agent, or telegraph dispatcher, or many other offices in which employees of railroads are at work. It would be equally absurd to hold that employees of a railroad corporation engaged in the construction of a roundhouse or in any other work not at all connected with the operation of the cars, were engaged in work inherently dangerous. They would be in no more danger than any other like employee of any other master. In short, the reason which sustains said section 193 of the Constitution being the inherent danger attending the actual operation of railroad trains, the remedy must be limited to those employees whom such danger imperils."

■ The trial court in this case adopted the view that section 162 of the Virginia Constitution, which relieves certain railroad employees of the fellow-servant and assumed risk doctrines, has no application to this plaintiff—this, of course, upon the ground that he was not engaged in any hazardous railroad work; that his work at the tie-treating plant of the Norfolk and Western Railway Company in connection with the moving of

these tram cars in and out of the adzing shed was not covered thereby. We agree with this conclusion.

■ In our view of the facts of this case, however, the substance of which we have recited, even if the trial court had given every instruction which was offered for the plaintiff and refused, there could have been but one proper verdict and that would be adverse to his claim. He has not shown by a preponderance of the evidence that the original negligence charged against the company was the cause of his injury. Even if it could be fairly said, under the evidence, that there may have been some actionable negligence which may have been the cause of his injury (and this question was clearly submitted to the jury), this would be insufficient to support a recovery, for if it is equally as probable that his present condition is due to some other cause or causes than to his fall, he must fail. It is unnecessary to cite authority for this proposition.

Viewing the case as a whole, our conclusion is that there could have been no other proper verdict than that which the jury returned, and therefore there is no error in the judgment.

*Affirmed.*